IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LENNOX AES HOLDINGS LLC
and LENNOX AES INDUSTRIES
LLC,

Plaintiffs,

v.

JASON BENTON,

Defendant.

Civil Action No. 25-755-CFC

---

David J. Teklits and Rachel R. Tunney, MORRIS, NICHOLS, ARSHT &
TUNNELL LLP, Wilmington, Delaware; James V. Leito IV, Jacqueline G. Baker,
and Pete Curran, NORTON ROSE FULBRIGHT US LLP, Dallas, Texas

*Counsel for Plaintiffs*

Jody C. Barillare, Brian Loughnane, and Cassidy D. Britt, MORGAN, LEWIS &
BOCKIUS LLP, Wilmington, Delaware; Jason R. Scherr, MORGAN, LEWIS &
BOCKIUS LLP, Washington, D.C.; Royal C. Dumas, RUSHTON, STAKELY,
JOHNSTON & GARRETT, P.A., Montgomery, Alabama

*Counsel for Defendant*

## **MEMORANDUM OPINION**

December 9, 2025
Wilmington, Delaware

COLM F. CONNOLLY
CHIEF JUDGE

This case began on June 2, 2025 in Delaware's Court of Chancery when Plaintiffs Lennox AES Holdings LLC and Lennox AES Industries LLC (collectively, Lennox) sued Defendant Jason Benton for breach of contract and tortious interference with prospective business opportunities. D.I. 1-1 at 15–19.[1] Benton removed the case to this Court on June 19. D.I. 1.

Benton is currently and was throughout 2023 the owner of three companies relevant here: AES Industries, Inc. (AES Industries), AES Mechanical Services Group, Inc. (AES Mechanical), and AES Sunoptics, Inc. (Sunoptics). This case arises out of an asset purchase agreement (the APA) executed by Benton and two of those companies—AES Industries and AES Mechanical—on the seller side and Lennox AES Holdings LLC and its parent Lennox International, Inc. on the buyer side. D.I. 73-1 at 2–3, 71. The APA was signed on September 20, 2023. D.I. 73-1 at 2.

Lennox seeks by its Complaint (1) declarations that Benton breached the noncompetition and nonsolicitation provisions of the APA and tortiously interfered

---

[1] Unless noted otherwise, cited page numbers for docketed filings refer to the page numbers assigned by CM/ECF.

with Lennox's reasonable business opportunities; (2) damages; (3) disgorgement of profits; (4) injunctions "[p]reliminarily and permanently enjoining Benton from violating [noncompetition and nonsolicitation provisions] of the APA and enjoining [him] from manufacturing aluminum skylight caps through Sunoptics"; and (5) attorneys' fees and costs. D.I. 1-1 at 20–21.

Pending before me is Lennox's motion for a preliminary injunction. D.I. 56. Lennox seeks by its motion an injunction preliminarily enjoining Benton from "caus[ing] Sunoptics to . . . sell[] any metal skylight caps (including the Sunoptics Cap) to any third parties," or alternatively, an injunction preliminarily enjoining Benton from "caus[ing] Sunoptics to . . . sell[] any metal skylight caps (including the Sunoptics Cap) . . . to Walmart and other [AES Industries and AES Mechanical] customers at the time of the APA." D.I. 57 at 27; *see also* 11.19.25 Prelim. Inj. Hr'g Tr. (docketed as D.I. 81) 5:8–25.

I have reviewed the parties' briefing, supporting declarations, and exhibits filed in support of and opposition to the motion and held a full-day hearing on the motion on November 19, 2025. This Memorandum Opinion constitutes my findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a)(2).

2

I.

The flat rooftops of large commercial buildings—think of a Target or Walmart store, for example—are often constructed with numerous rectangular-shaped openings for heating, ventilation, and air conditioning (HVAC) units and skylights. The openings usually range in size from 4x4 feet to 5x6 feet. Typically, the HVAC unit or skylight is mounted on a short wall called a "curb" or "roof curb" that surrounds the opening. If the building owner or tenant later removes a rooftop HVAC unit or skylight, it needs to cover the opening left by that removal. Installing a so-called "curb cap" is a common means of addressing this situation. A curb cap is an insulated metal cover that fits over a rooftop curb and prevents light and water from passing into the building. Thus, a curb cap is a solution that does not require the owner to remove the curb, insulate the roof, or patch a hole.[2]

––––––––––––––––––

[2] My findings in this paragraph are based primarily on the declaration of Allen Gunn. D.I. 58-42. Gunn worked for Benton as the chief operating officer of AES Industries, AES Mechanical, and Sunoptics and was involved on Benton's behalf in the negotiation of the APA. After the APA closed, Gunn and Benton went to work for Lennox, and Gunn continues to this day to work for Lennox. I found Gunn to be a credible witness based on (1) the content of his declaration and the excerpts of his deposition submitted in connection with the pending motion; (2) the consistency of his declaration internally and with other documents submitted by the parties; and (3) the tone and content of the communications Gunn had with Benton about the subject matter of the dispute before me. D.I. 58-42; D.I. 68-5; D.I. 73-51; D.I. 73-28.

Prior to the date of the APA, AES Industries was, to use Benton's words, "a leading manufacturer of HVAC Accessories," including "Roof Curbs," "Adaptor Curbs," and "Architectural Screening," and had a division called "AES Reclaim and Salvage" that "[p]rovide[d] HVAC [r]ecycling [s]ervices." D.I. 58-5 at 2, 5; D.I. 58-37 at 53:23–54:4. AES Mechanical was at that time, in Benton's words, "exclusively focused on planned HVAC replacement programs." D.I. 58-5 at 2, 5. Sunoptics was, again in Benton's words, engaged at that time in the "design[] and manufactur[ing] [of] prismatic skylights and daylighting delivery systems that harness the power of the sun to maximize the cost-effective energy savings of daylighting in large retail, manufacturing and distribution center applications." D.I. 58-5 at 2, 5.

At the time the APA was signed, AES Industries manufactured and sold roof curbs and curb caps. D.I. 58-5 at 7–9; D.I. 58-31 at 2. One of those caps, which I will refer to as the AES Cap, is central to the dispute at hand. In marketing materials, AES Industries referred to the AES Cap as a "curb cap," "energy cap," and "skylight cover." D.I. 58-5 at 8; D.I. 58-31 at 2. The AES Cap is made of galvanized steel and is insulated. D.I. 58-5 at 8; D.I. 58-31 at 2. When mounted on roof curbs, it eliminates the passage of visible light and water. *See* D.I. 1-1 ¶ 21 figs. 2–3; D.I. 67-4 at 2; D.I. 58-5 at 7; D.I. 58-31 at 2.

At the time of the APA's closing, Sunoptics sold skylights and smoke vents. D.I. 58-5 at 3, 5, 13; D.I. 73-19 at 3, 8. Sunoptics had never made or sold a curb cap before Benton and Lennox signed the APA. D.I. 58-37 at 85:10–25.

## II.

The APA is titled "Asset Purchase Agreement." D.I. 73-1 at 2–3. It refers to AES Industries and AES Mechanical collectively as "the AES Companies." D.I. 73-1 at 3. And it defines "Seller" as the AES Companies and Benton. D.I. 73-1 at 3. Its first three "Recitals" read as follows:

> WHEREAS, the AES Companies are engaged in the business of HVAC accessory and rooftop curb manufacturing and installation, rooftop HVAC replacement and reclamation services (the "Business");

> WHEREAS, the AES Companies are wholly-owned by Benton; and

> WHEREAS, Seller desires to sell to [Lennox] the Purchased Assets, and [Lennox] wishes to purchase from Seller the Purchased Assets and assume from Seller the Assumed Liabilities, all on the terms and conditions set forth in this Agreement[.]

D.I. 73-1 at 3 (bold and underline omitted). Although the APA has dozens of defined terms, it does not define HVAC, HVAC accessory, rooftop curb, rooftop curb installation, or rooftop HVAC replacement and reclamation services. *See* D.I. 73-1 at 3–15.

5

The APA defines "Purchased Assets" in relevant part as "all of Sellers' right, title and interest in and to all assets, properties and rights (other than the Excluded Assets) that are used or held for use in connection with the Business, whether tangible or intangible, real, personal or mixed[.]" D.I. 73-1 at 16–18, § 2.2.1. "Excluded Assets" is also a defined term in the APA. D.I. 73-1 at 18, § 2.2.2. Neither the AES Cap nor any other skylight-related product manufactured or sold by AES Industries or AES Mechanical before the date of the APA is an Excluded Asset under the APA. Thus, the AES Cap was a Purchased Asset covered by the APA.

Lennox paid Benton approximately $91 million for the Purchased Assets. D.I. 73-1 at 20, § 2.4; *see also* 11.19 Tr. 80:9–10. In consideration for that payment, Benton agreed to work for Lennox after the closing of the APA and agreed to abide by noncompetition and nonsolicitation provisions set forth in Section 7.11 of the APA. D.I. 73-3; D.I. 73-1 at 58, § 8.1.7; D.I. 58-2 at 39, Schedule 8.1.7(a); D.I. 58-2 at 97–104, Ex. C-2; D.I. 73-1 at 55, § 7.11.1; D.I. 73-1 at 59–60, § 8.3.1(j); D.I. 58-2 at 156–67, §§ 1–3. The noncompetition provision bars Benton for five years after the closing of the APA from "providing, distributing or selling within the [United States] products or services substantially similar to those provided, distributed or sold by the Business, as conducted by the AES Companies prior to the Closing." D.I. 73-1 at 54, § 7.11.1(b). The

6

nonsolicitation provision bars Benton for five years after the closing of the APA from "solicit[ing] any customer of Sellers who is or has been a customer on or prior to the Closing Date [of the APA] for the purpose of providing, distributing or selling products or services similar to those provided, distributed or sold by the Business, as conducted by the AES Companies prior to the Closing." D.I. 73-1 at 55, § 7.11.2.

There is a carve-out to the noncompetition and nonsolicitation provisions. The APA expressly states that "nothing in this Section 7.11 shall prevent or limit Sellers or their Affiliates from operating the Sunoptics skylight business as currently conducted as of the date hereof . . . ." D.I. 73-1 at 55, § 7.11.1(b)(ii)(B) (underline omitted).  And Lennox "acknowledge[d] and agree[d]" in the APA that "Benton may spend a portion of his business time . . . on the Sunoptics skylight business as currently conducted as of the date hereof." D.I. 73-1 at 55, § 7.11.1(b)(ii)(C).

III.

After the APA closed, Benton worked for Lennox for approximately fourteen months.  D.I. 58-37 at 322:22–323:2; D.I. 67-7 ¶¶ 2, 22, 25; D.I. 58-18 at 2.  During that timeframe, Lennox manufactured and sold the AES Cap. D.I. 58-8 at 2–3; 11.19 Tr. 19:12–20:2, 170:8–171:8; D.I. 58-37 at 84:13–85:2, 161:7–14; D.I. 67-2 at 2; D.I. 58-42 ¶¶ 9–10.

7

At some point in the last quarter of 2024, Sunoptics began to design a curb cap to cover openings for skylights (the Sunoptics Cap).  D.I. 68-9 at 20; D.I. 58-35 at 45:3–6; D.I. 67-7 ¶ 29; D.I. 69 ¶ 14.  In December 2024, Benton left Lennox, D.I. 67-7 ¶¶ 2, 25, and began to work full time at Sunoptics, D.I. 58-18 at 2.  In January 2025, Benton emailed Walmart with an offer to sell it the Sunoptics Cap "as an option for covering units in electronics and other designated areas of [Walmart's] store[s]."  D.I. 58-18 at 2.  Walmart had been a customer of AES Industries and AES Mechanical prior to the date of the APA.  D.I. 58-10 at 14, 16; D.I. 58-32 at 11–14; D.I. 58-42 ¶¶ 7–8, 12; D.I. 58-36 at 56:10–57:2; D.I. 68-8 at 45:1–21, 84:16–85:4.  Benton described the Sunoptics Cap in his email to Walmart as a "skylight cover," D.I. 58-18 at 2, and the sales sheet he attached to his email described the Sunoptics Cap as an "Insulated Aluminum Skylight Cover," D.I. 58-18 at 4; *see also* D.I. 58-9 at 2, 10.

On April 15, 2025, an employee in Walmart's procurement department asked Lennox by email if Lennox "own[ed] the rights to the skylight insulated cap?" and if Sunoptics "ha[s] the right to manufacture it as well?"  D.I. 16-3 at 2; D.I. 73-18 ¶ 36 (Benton's declaration referring to "an inquiry Lennox received from Walmart about Sunoptics's aluminum cover").  As a result of this email, Lennox reached out to Benton to express its concern that Benton was violating the noncompetition and nonsolicitation provisions in the APA.  *See* D.I. 73-28; D.I. 73-29; D.I. 73-18

8

¶¶ 36–39.  A few days later, in an email to Walmart, this time cc'ing Lennox, Benton "apolog[ized] for any miscommunication" and said that he "ha[d] been notified [by Lennox] of potential concerns and would like to temporarily retract our offering for the attached product until these issues are resolved."  D.I. 58-19 at 2; *but see* D.I. 58-38 at 100:24–101:25 (Sunoptics' Vice President of Operations and Business Development Grant Grable testifying that eleven Sunoptics Caps have been sold to Walmart and that some of the caps have been delivered to Walmart).  Benton attached to the email a sales sheet for the Sunoptics Cap. D.I. 58-19 at 2, 4.  This sales sheet described the Sunoptics Cap not as a skylight cover, but instead as a "100% Opaque Thermal Skylight."  D.I. 58-19 at 4; *see also* D.I. 73-45 at 4 (same sales sheet titled "100% Opaque Thermal Skylight" sent by Sunoptics to Span Construction less than two hours later on April 22, 2025).

In the weeks that followed, Lennox tried to persuade Benton that he was barred under the terms of the APA from marketing and selling the Sunoptics Cap. *See, e.g.*, D.I. 16-7.  On June 2, having failed to obtain an agreement from Benton to forgo marketing and selling the Sunoptics Cap, Lennox filed its Complaint in the Court of Chancery.

As noted above, Benton removed the case to this Court on June 19.  On July 3, the parties submitted for my signature a proposed order that required briefing on Lennox's request for a preliminary injunction to be completed on

9

November 10.  On July 8, I signed the order and scheduled a hearing on the preliminary injunction for November 19.

In the meantime, on July 17, Lennox filed a motion for a temporary restraining order (D.I. 15) and, the next day, a motion to remand the case to the Court of Chancery (D.I. 20).  Lennox stated in its remand motion that it "does not challenge th[is] Court's subject matter jurisdiction (but rather seeks remand based on waiver of the right to remove)."  D.I. 20 at 1–2.

In a Memorandum Order issued on July 22, I denied Lennox's motion for a temporary restraining order.  D.I. 23.  I stated in relevant part in the Memorandum Order:

> [T]he [APA's] carveout provision . . . states that the non-compete agreement does not prevent Benton "from operating the Sunoptics skylight business as currently conducted as of the date hereof."  D.I. 16-2 at 54.  *Benton represents in his brief, and I have no reason to doubt, that when the agreement closed, Sun[o]ptics sold skylight caps.*

D.I. 23 at 6 (emphasis added) (citing D.I. 18 at 13).  Because I believed at the time I issued the Memorandum Order that Sunoptics had sold skylight caps before the APA was signed, I concluded that Lennox had not made a clear showing that Benton had violated or will violate in the future the APA's noncompetition provision.  D.I. 23 at 6–7.

10

It turns out that I was wrong not to doubt the representations in Benton's briefing. Two months after I issued the Memorandum Order, Benton testified in a deposition as follows:

> Q. Prior to your execution of the APA, Sunoptics had not manufactured a metal skylight cover; correct?
>
> A. Correct.
>
> Q. And prior to your execution of the APA, Sunoptics had not marketed any of its manufactured products as being a skylight cap or a skylight cover; correct?
>
> MR. SCHERR: Objection, ambiguous.
>
> A. I'm not sure, James, if I know everything we've marketed at Sunoptics at this -- at this stage in my journey with Sunoptics.
>
> Q. Sitting here today, you can't recall any; correct?
>
> A. Not that I can recall.
>
> Q. All right.

D.I. 58-37 at 85:10–25. To date, Benton has not adduced any record evidence that shows that Sunoptics sold to anyone a curb cap—for mounting on either skylight curbs or HVAC curbs—before the APA was consummated.

IV.

The standards that govern the resolution of the pending motion were

succinctly set forth by the Supreme Court in *Lackey v. Stinnie*, 604 U.S. 192

(2025) earlier this year:

> Preliminary injunctions . . . do not conclusively resolve
> legal disputes. In awarding preliminary injunctions, courts
> determine if a plaintiff is likely to succeed on the merits—
> along with the risk of irreparable harm, the balance of
> equities, and the public interest. The purpose of a
> preliminary injunction is merely to preserve the relative
> positions of the parties until a trial on the merits can be
> held, and to balance the equities as the litigation moves
> forward. Crafting a preliminary injunction is an exercise
> of discretion and judgment, often dependent as much on
> the equities of a given case as the substance of the legal
> issues it presents.

*Id.* at 200 (emphasis, citations, and internal quotation marks omitted).

A.

I begin with whether Lennox has demonstrated that it is likely to succeed on

the merits. To make this showing, Lennox "needs only to show . . . a reasonable

chance, or probability, of winning[]." *Singer Mgmt. Consultants, Inc. v. Milgram*,

650 F.3d 223, 229 (3d Cir. 2011). Under Third Circuit law, "[a] 'likelihood' does

not mean more likely than not." *Id.* Thus, it means something less than a 50%

chance.

Lennox argues that it is likely to prevail in its breach of contract claim

because the record evidence demonstrates that Benton has breached and continues

12

to breach the noncompetition and nonsolicitation provisions of the APA. D.I. 57 at 16. Benton does not dispute that Lennox has demonstrated that he breached and continues to breach the APA's nonsolicitation provision. *See generally* D.I. 65. But he says that Lennox has not met its burden to show a likelihood of success with respect to the noncompetition provision. D.I. 65 at 19.

As noted above, the APA's noncompetition provision bars Benton from directly or indirectly through Sunoptics "providing, distributing or selling within the [United States] products or services substantially similar to those provided, distributed or sold by the Business, as conducted by the AES Companies prior to the [APA's] Closing." D.I. 73-1 at 54, § 7.11.1(b). Lennox says that Benton's efforts on behalf of Sunoptics to sell the Sunoptics Cap violate this provision because the AES Companies sold the AES Cap before the date of the APA, those sales fall within the APA's definition of Business, and the Sunoptics Cap is substantially similar to the AES Cap. Benton does not dispute that the AES Companies sold the AES Cap to customers before the APA's closing. *See generally* D.I. 65; *see also* 11.19 Tr. 32:20–24, 33:7–9, 135:11–13. But he argues that the APA's noncompetition provision does not bar him from selling the Sunoptics Cap because sales of the AES Cap do not fall within the APA's definition of Business and because even if they did, the Sunoptics Cap is not substantially similar to the AES Cap. Benton argues in the alternative that

13

Section 7.11's carve-out "protects" his right to sell the Sunoptics Cap.  D.I. 65 at 24.

The parties' dispute boils down to three issues: (1) the meaning of the term "Business" in the first recital of the APA; (2) whether the AES Cap and the Sunoptics Cap are substantially similar; and (3) whether Section 7.11's carve-out allows Benton to sell the Sunoptics Cap.

1.

As noted above, the first recital provides that "the AES Companies are engaged in the business of HVAC accessory and rooftop curb manufacturing and installation, rooftop HVAC replacement and reclamation services."  D.I. 73-1 at 3. Lennox reads the recital as describing the business—that is, the entirety of the business—the AES Companies were engaged in as of the date of the APA.  In its view, because AES Industries manufactured and sold the AES Cap at the time of the APA's signing and because the Sunoptics Cap is substantially similar to the AES Cap, the noncompetition provision of the APA bars Benton from selling the Sunoptics Cap.  Benton counters that the recital describes only a defined portion of the business the AES Companies were engaged in as of the signing of the APA.  In his view, since skylight caps are not generically understood to be HVAC accessories or roof curbs, the AES Companies' sales of the AES Cap do not fall

14

under the recital's definition of Business and the noncompetition provision does not bar him from causing Sunoptics to make and sell the Sunoptics Cap.

The recital itself can be read reasonably to support both sides' competing views of the meaning of Business. It is reasonable to read the phrase "the AES Companies are engaged in the business of" in the context of an asset purchase agreement to describe *the* business (i.e., the one and only business) that the AES Companies were engaged in at the time of that agreement. But it is also reasonable to read the phrase as describing one of several businesses the AES Companies were engaged in at that time. Beyond the recital, there is language in the APA that both sides can point to in support of their competing positions. The APA's definitions of Purchased Assets and Excluded Assets, for example, favor Lennox, as they suggest that the parties deemed the AES Cap (which is not an Excluded Asset and therefore is a Purchased Asset) to fall within the Business. The numerous defined terms in the APA coupled with the absence of definitions for HVAC, HVAC accessory, rooftop curb, rooftop curb installation, rooftop HVAC replacement, and reclamation services also favor Lennox. On the other hand, the use of the phrase "as conducted by the AES Companies" to modify "Business" in the noncompetition and nonsolicitation clauses arguably favors Benton, as it suggests that Business describes a generic form of HVAC- and roof curb-related

15

business activity as opposed to the specific business activity the AES Companies were engaged in at the time of the APA.

The recital's definition of Business is, in short, ambiguous under Delaware law (i.e., the law that governs the APA, D.I. 73-1 at 67–68, § 11.4.1). *See Vill. Prac. Mgmt. Co., LLC v. West*, 342 A.3d 295, 314 (Del. 2025) ("A provision in a contract is ambiguous when the provision in controversy is reasonably or fairly susceptible of different interpretations or may have two or more different meanings." (citation omitted)). And I must therefore resort to extrinsic evidence to interpret it. *See Energy Transfer, LP v. Williams Cos., Inc.*, 2023 WL 6561767, at *18 (Del. Oct. 10, 2023) ("Where a contract is ambiguous, the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." (internal quotations and citation omitted)).

Based on the record evidence it has adduced so far, I think it reasonably likely that Lennox will ultimately persuade me that its interpretation of Business is the correct interpretation. ("Contract interpretation is a question of law," *Daniel v. Hawkins*, 289 A.3d 631, 645 (Del. 2023) (citation omitted), and thus an issue for the court to decide.) For example, the fact that the parties negotiated the purchase price based on the consolidated EBITDA of the AES Companies in full and did not exclude EBITDA for skylight caps and skylight curbs supports Lennox's position that Business refers to the entirety of the business the AES Companies were

16

engaged in at the time of the APA. D.I. 58-6 at 8, § 2; D.I. 67-9 at 7, § 2.

Lennox's reading of Business is also supported by a PowerPoint slide Benton sent

to Lennox at the beginning of the parties' discussions that led to the APA. Benton

described AES Industries in the slide as a "leading manufacturer of HVAC

Accessories," and he identified "Architectural Screening" as an example of an

"HVAC accessory" made by AES Industries. D.I. 58-10 at 7. Architectural

screening is the placement of screens around the perimeter of a roof or around

equipment on a roof. D.I. 58-37 at 56:21–24. As Benton admitted during his

deposition, architectural screening is not an "HVAC accessory" in the generic

sense of that term. D.I. 58-37 at 65:22–66:3. Thus, Benton's identification of

architectural screening as an "HVAC accessory" in the context of his description

of AES Industries during his discussions with Lennox is consistent with Lennox's

view that the definition of Business refers not to a generic HVAC-accessory-

related business, but instead to the specific (and entire) business the AES

Companies were engaged in at the time of the APA.

    The principal extrinsic evidence Benton relies on is a Master Purchase and

Supply Agreement (the Supply Agreement) executed by Lennox and Sunoptics in

October 2023 as a condition for the closing of the APA.[3] Lennox is required under

---

[3] Benton argues that the Supply Agreement is properly characterized as intrinsic evidence because it is ancillary to the APA. D.I. 65 at 23. Since I have deemed the term "Business" ambiguous and am considering the Supply Agreement in my

the terms of that agreement to supply Sunoptics with certain roof curbs (that can be

used for skylights) at certain prices. D.I. 73-23 at 2, § 1; D.I. 73-23 at 10–17,

Schedule 1. Section 2(b) of the Supply Agreement has a noncompetition provision

that bars Sunoptics from "manufactur[ing] or sell[ing] metal curbs or HVAC curb

adaptors" for at least three years and, if Benton "continues to directly or indirectly

hold a majority of the ownership interest in [Sunoptics]," up to five years.

D.I. 73-23 at 2, § 2(b).

Benton argues that "the parties used [the Supply Agreement] to identify the

specific products manufactured by AES [Industries][4] that Sunoptics could not

manufacture under the non-compete" provision in the APA. D.I. 65 at 14; *see also*

D.I. 65 at 7 ("[T]he express terms of the restrictive covenant here [i.e., in the APA]

*permit* Benton to operate in the skylight industry without restrictions beyond those

specified in the Supply Agreement." (emphasis in the original)). Nothing in the

APA, however, states or suggests that the Supply Agreement has any bearing on

the meaning of Business in the APA's recitals or the scope of the APA's

---

interpretation of the term, whether the Supply Agreement is characterized as
intrinsic or extrinsic evidence is of no moment.

[4] Although Benton uses the term "AES" twenty-three times in his opposition brief,
he never provides in his brief a definition for the term and never identifies which
AES company he is referring to when he uses "AES." *See generally* D.I. 65. In
his declaration submitted in opposition to the motion, Benton defines "AES" as
AES Industries. *See* D.I. 73-18 ¶ 2.

noncompetition provision. Neither the AES Companies nor Benton was a party to the Supply Agreement. D.I. 73-23 at 2, 8–9. Sunoptics did not sell assets to Lennox and was not a party to the APA. D.I. 73-1 at 2, 71. And notably, the Supply Agreement's noncompetition provision binds Sunoptics for at least three years regardless of whether Benton continues to own or is otherwise associated with Sunoptics. D.I. 73-23 at 2, § 2(b). Lennox is not suing Sunoptics for breaching the noncompetition provision of the Supply Agreement. Lennox is suing Benton for breaching the noncompetition and nonsolicitation provisions of the APA. The two agreements bind different parties, serve different purposes, cover different time periods, and have separate noncompetition obligations.

    In a sworn declaration submitted in opposition to Lennox's motion, Benton states that during the negotiation of the APA he had "offline" discussions with Jaspreet Singh, Lennox's principal negotiator, and that Benton "discussed with Jaspreet Singh that Sunoptics would not be able to be restricted from manufacturing or selling overlapping products like burglar bars, fall protection systems, or skylight covers." D.I. 73-18 ¶¶ 14, 16. According to Benton, "[f]ollowing th[at] discussion, Jaspreet Singh sent [Benton] an email that memorialized Lennox's proposed restrictions." D.I. 73-18 ¶ 16. The email in question, however, concerns the noncompetition provision of the Supply Agreement, not the APA, D.I. 67-14 at 6; and, as noted above, the restrictions in

19

the Supply Agreement's noncompetition provision—prohibiting Sunoptics from manufacturing and selling metal curbs and HVAC curb adaptors—have no bearing on the recitals or noncompetition provision in the APA. Putting aside the email, and as I noted during the preliminary injunction hearing, Benton's averments in the declaration about "offline" oral discussions with Jaspreet Singh are, to put it charitably, difficult to reconcile with his sworn deposition testimony. His credibility is further undermined by his Orwellian re-characterization of the Sunoptics Cap from a "skylight cover" to the oxymoronic "100% opaque skylight" once Lennox became aware of his attempts to sell Walmart the Sunoptics Cap in April 2025. These questions about Benton's credibility further convince me that Lennox has a reasonable chance of success in persuading me that its interpretation of Business is the correct interpretation.

2.

Benton argues that even if the AES Companies' pre-APA sales of the AES Cap were deemed to be within the scope of the recital's definition of Business, the Sunoptics Cap is not substantially similar to the AES Cap and therefore he can sell the Sunoptics Cap without violating the APA's noncompetition provision. Lennox, however, has adduced sufficient record evidence to make it reasonably likely that it will persuade the jury that the two caps are substantially similar.

20

Benton himself described the AES Cap and the Sunoptics Cap in a text to Allen Gunn as "comparable solution[s]." D.I. 58-24 at 3. And in a February 2025 email to two Sunoptics employees, he described the Sunoptics Cap as "similar" to the AES Cap. D.I. 73-27 at 2. Both caps are made of metal and eliminate the passage of light and water into a building. D.I. 58-42 ¶ 17; *compare* D.I. 58-5 at 8; D.I. 68-7 at 7 *with* D.I. 58-18 at 4; D.I. 73-29 at 6; D.I. 58-19 at 4; *see also* D.I. 58-41 at 59:2–22. They come in substantially similar sizes. *Compare* D.I. 58-5 at 8; D.I. 68-7 at 7 *with* D.I. 58-18 at 4; D.I. 73-29 at 6; D.I. 58-19 at 4. The two caps are made of the same foam insulation and have substantially similar insulation R values. D.I. 58-42 ¶ 17; *compare* D.I. 58-5 at 8; D.I. 68-7 at 7 *with* D.I. 58-18 at 4; D.I. 73-29 at 6; D.I. 58-19 at 4. And they are installed in the same fashion—i.e., set on top of a curb and attached by screws drilled horizontally through pre-punched holes on the cap's flanges. D.I. 58-42 ¶ 17.

Although there are differences in the weight, load capacity, metal type, and expected lifespan of the two caps, the important features they share make it reasonably likely that the jury will find the caps to be substantially similar.

3.

Benton argues in the alternative that even if Sunoptics' sales of the Sunoptics Cap fall within the APA's noncompetition provision, Section 7.11's carve-out allows him to sell the Sunoptics Cap. The carve-out, however, removes

21

from the noncompetition provision only "the Sunoptics skylight business" that was "currently conducted [by Sunoptics] as of the date" of the APA. D.I. 73-1 at 55, § 7.11.1(b)(ii)(B). Tellingly, Benton has not pointed to a single invoice that shows a sale of any curb cap by Sunoptics at any time before the APA was signed. That failure alone makes it likely that a rational jury would reject Benton's argument that he can sell the Sunoptics Cap under Section 7.11's carve-out.

Benton argues that Sunoptics' pre-APA sales of skylights with so-called "opaque" lenses and louvers designed to reduce the amount or harshness of light coming through the skylight constitute sales of "skylight covers" and are the equivalent of sales of skylight caps. D.I. 65 at 9–10, 26. But accepting his logic requires equating a skylight with a cover for a skylight—something no rational jury would do. Equally if not more dubious is Benton's description of the Sunoptics Cap—a cap made of metal with no opening or translucent glass or plastic that would allow for the passage of light—as a "100% Opaque Thermal Skylight." Here, too, I think it likely that a jury will quickly reject Benton's Orwellian sophistry.

\* \* \* \*

In sum, I find based on the record evidence that Lennox has a reasonable likelihood of prevailing on its claim that Benton breached his noncompetition obligations under the APA.

22

B.

I turn next to the risk of irreparable harm. The parties agreed in the APA that Lennox "would be irreparably harmed if any of the provisions of this Section 7.11 are not performed." D.I. 73-1 at 56, § 7.11.5 (underline omitted). Lennox argues that I should enforce this stipulation as written and cites a case in which Judge Andrews held that such a stipulation is sufficient under Delaware law to establish irreparable harm for the purpose of issuing preliminary injunctive relief. D.I. 57 at 31 (citing *TP Group–CI, Inc. v. Vetecnik*, 2016 WL 5864030, at *2 (D. Del. Oct. 6, 2016) (citing *Cirrus Holding Co. v. Cirrus Indus., Inc.*, 794 A.2d 1191, 1209 (Del. Ch. 2001))). (To its credit, citing another decision by Judge Andrews, Lennox "acknowledge[d]" in its briefing that "other courts require something more than a stipulation." D.I. 57 at 31 (citing *Cabela's, LLC v. Highby*, 362 F. Supp. 3d 208, 223 (D. Del. 2019).) Benton, a sophisticated party who garnered more than $90 million from the APA and had sophisticated counsel representing him in the negotiation of the APA, does not dispute that I should enforce the APA's irreparable harm stipulation. *See generally* D.I. 65. Accordingly, I find that Lennox has satisfied its burden to show that it has suffered and will continue to suffer irreparable harm as a result of Benton's breaches of the APA.

C.

With respect to the equities at stake, I find that on balance they weigh in favor of Lennox.  I agree with Lennox that Benton's knowledge of Lennox's customers and especially Walmart would make his competition with Lennox particularly effective and unfair.  (According to Benton, Walmart is "the largest commercial owner of skylight products in the world," D.I. 18 at 4, and has more than 1,000,000 "aging skylights," D.I. 66-7 at 2.)  I am also not persuaded that Benton would suffer any significant harm by being precluded from selling the Sunoptics Cap between now and the ultimate resolution of this case, especially since I am willing to try the case as early as February next year.  Walmart, the principal target of Benton's contemplated sales efforts, has informed the parties that it will not buy the Sunoptics Cap until this matter is resolved.  D.I. 68-8 at 61:4–22; 11.19 Tr. 132:7–18.  Thus, a preliminary injunction at this stage will do little if anything more than maintain the status quo.  *See Lackey*, 604 U.S. at 200 ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . ." (citation omitted)).  Benton's delaying of the resolution of this dispute by removing it from the Court of Chancery, a court with a well-deserved reputation for excellence and

24

speed, also weighs in Lennox's favor.  This is especially so because in

Section 11.4.2 of the APA, Benton

> ***CONSENT[ED]   TO   THE   EXCLUSIVE
> JURISDICTION OF THE DELAWARE COURT OF
> CHANCERY*** (AND  ANY  STATE  APPELLATE
> COURT THEREFROM LOCATED IN THE STATE OF
> DELAWARE)  OR  FEDERAL  COURT  LOCATED  IN
> NEW   CASTLE   COUNTY   IN   THE   STATE   OF
> DELAWARE AND IRREVOCABLY AGREE[D] THAT
> ALL  ACTIONS  OR  PROCEEDINGS  RELATING  TO
> THIS   AGREEMENT   OR   THE   TRANSACTIONS
> CONTEMPLATED BY THIS AGREEMENT MAY BE
> LITIGATED IN SUCH COURTS.

D.I. 73-1 at 68, § 11.4.2 (capitalization in original) (emphasis added).

Benton says that "[t]he adverse impact [of a preliminary injunction] on

Sunoptics is tremendous, because it would prevent Sunoptics from competing with

other skylight companies by denying Sunoptics the ability to offer a full suite of

end-of-life products to its skylight customers." D.I. 65 at 31.  But a Walmart

procurement officer testified at his deposition that he was unaware of any skylight

caps on the market other than the AES Cap and the Sunoptics Cap, D.I. 58-41

at 60:6–11; and Sunoptics' Vice President of Operations and Business

Development Grant Grable testified in his deposition that he was "not aware of

other products that are competitive with the [Sunoptics Cap]." D.I. 71 at 16

(quoting D.I. 58-38 at 226:1–4).

Benton also argues that the equities weigh in his favor because Allen Gunn "discussed the [Sunoptics Cap] repeatedly with Sunoptics personnel and lent material support to bringing it to market" and "Benton relied on Gunn's assistance by causing Sunoptics to invest substantial resources" to develop the Sunoptics Cap. D.I. 65 at 29–30. (Benton argues in his opposition brief that this alleged behavior by Gunn and Benton's reliance on it estops Lennox from enforcing the APA's noncompetition provision. D.I. 65 at 20, 29–30. At oral argument, Benton said that he was instead "advancing th[e] argument as one of the factors in balancing the equities in the Court's evaluation of proprietary preliminary emergency relief." 11.19 Tr. 184–85.) Gunn, however, whom I found to be credible, says that Benton provided him the sales sheet for the Sunoptics Cap in April 2025 (i.e., when this dispute arose) and that he saw the Sunoptics Cap for the first time in September 2025. D.I. 58-42 ¶ 16. I also find it telling that although Benton had the opportunity to depose Gunn, he cites nothing from Gunn's deposition as supporting his allegations that Gunn provided him material support in bringing the Sunoptics Cap to market. Given the questions I have about Benton's credibility, I am not willing to find that Gunn played a role in the development of the Sunoptics Cap in the absence of testimony from Gunn confirming that allegation.

In sum, then, the balance of equities weighs in favor of ordering a preliminary injunction in place until the case is resolved.

D.

"As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994). The circumstances here do not warrant an exception to that general rule. The public has a strong interest in the enforcement of contracts negotiated by sophisticated parties with sophisticated counsel.

E.

Benton argues in passing in his briefing that the APA's noncompetition provision is unenforceable because "Lennox's legitimate interest in restricting competition relates only to the HVAC industry," D.I. 65 at 28, and Lennox does not have "a legitimate economic interest [in] restricting competition in the skylight industry," D.I. 65 at 28 (capitalization omitted). This argument rises and falls with Benton's argument that Business does not encompass the AES Companies' sales of the AES Cap. Accordingly, for the same reasons I found that Lennox is reasonably likely to succeed on the merits of its interpretation of Business, I reject Benton's assertion that the APA's noncompetition provision is unenforceable.

\* \* \* \*

Having determined that Lennox has a reasonable likelihood of succeeding on the merits of its breach of contract claims and given the parties' stipulation in the APA that Lennox will suffer irreparable harm from Benton's breach of the APA's noncompetition and nonsolicitation provisions and my determination that the balance of the equities and the public interest favor Lennox, I will exercise my discretion and grant Lennox's motion and enjoin Benton from selling metal caps to cover skylight openings until a final judgment is entered in this case.

A court, however, may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). And neither side addressed the security requirement of Rule 65(c) in its briefing. Accordingly, before I issue the preliminary injunction, I need to hear from the parties about the appropriate amount for a bond in this case. I will therefore order the parties to meet and confer about that issue and, if they cannot reach agreement on that issue, to file supplemental briefing on that question.

The Court will issue an order consistent with this Memorandum Opinion.