IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LENNOX AES HOLDINGS LLC
and LENNOX AES INDUSTRIES
LLC,

                Plaintiffs,

           v.

JASON BENTON,

                Defendant.

Civil Action No. 25-755-CFC

---

## MEMORANDUM ORDER

By an Order issued on March 27, 2026, I granted in part and deferred in part Plaintiffs' Motion to Dismiss Jason Benton's Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (D.I. 121) (the Motion). D.I. 135 at 5. Specifically, I dismissed Defendant Benton's Counterclaims II and III and otherwise deferred resolution of the Motion. With the trial of Counterclaims IV through VIII soon approaching, I write here to explain to the parties why I will deny the Motion with respect to those Counterclaims.

I.

As an initial matter, a few words need to be said about two recurring conclusory allegations in Counterclaims IV, V, and VI. I am not required to and do not accept those allegations as true for purposes of the Motion. *See Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("[C]ourts are not bound to accept as true a legal conclusion couched as a factual allegation") (internal quotation marks and citation omitted); *see also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017) ("[For] facial challenges to standing, we apply the same standard as . . . a motion to dismiss under Rule 12(b)(6).").

### A.

First, Benton (imprecisely) alleges that "[t]he Supply Agreement and the Post-Closing Employment Agreement are . . . contracts to which Lennox, Benton, and Sun[o]ptics were parties." D.I. 119 ¶¶ 199, 205, 210.

To be clear, Benton is not a party to the Master Purchase and Supply Agreement (the MPSA, or the Supply Agreement). D.I. 122-3 at 1 ("This [MPSA] . . . is between Lennox AES Holdings LLC and its affiliated companies . . . and AES Sunoptics, Inc. and its affiliated companies . . . ."); D.I. 122-3 at 7 (describing Lennox AES Holdings LLC and AES Sunoptics, Inc. as "the Parties" executing the MPSA); *see also* D.I. 143 at 10–11 (my April 2 Memorandum discussing that "the Ancillary Agreements . . . are individual agreements that are not incorporated or merged into the APA and thus the APA does not make Benton a party to [an Ancillary Agreement to which Benton is not already a party]"); D.I. 122-2 at 3, § 1.1 (the APA defining "Ancillary Agreements" to include the "the Supply

2

Agreement"); *see also* D.I. 97 at 10–11 (Intervenor Sunoptics, Inc. acknowledging that Benton is not a party to the MPSA and cannot assert a claim under the MPSA).

And Sunoptics is not a party to the Post-Closing Employment Agreement. D.I. 122-4 at 7 (Benton and Lennox International Inc. duly executing the Post-Closing Employment Agreement as "the parties hereto").

### B.

Second, Benton alleges that "[t]he Supply Agreement and the Post-Closing Employment Agreement are Ancillary Agreements incorporated by reference and merged into the APA." D.I. 119 ¶¶ 199, 205, 210.

The Supply Agreement is an Ancillary Agreement. D.I. 122-2 at 3, § 1.1 (defining "Ancillary Agreements" to include "the Supply Agreement . . . and the other agreements . . . and documents required to be delivered at or prior to the Closing hereunder"); *see also* D.I. 122-2 at 58–59, §§ 8.3.1(g), 8.3.2(e) (requiring a duly executed Supply Agreement to be delivered at Closing).

But Benton's *Post-Closing* Employment Agreement is not an Ancillary Agreement of the APA. *See* D.I. 122-2 at 3, § 1.1 (the APA defining "Ancillary Agreements" to include "agreements, certificates, instruments and documents required to be delivered at or prior to the Closing hereunder"); D.I. 122-2 at 57, § 8.1.7 (not requiring that each key employee enter an employment retention agreement at or prior to the APA's Closing). And as discussed in my April 2

3

Memorandum, "the Ancillary Agreements . . . are individual agreements that are not incorporated or merged into the APA and thus the APA does not make Benton a party to [an Ancillary Agreement to which Benton is not already a party]." D.I. 143 at 10–11.

Benton further alleges that "the APA and Ancillary Agreements" are "read together" to "reflect[]" "the parties' agreement." D.I. 119 ¶¶ 200, 206, 211.

I agree that unexecuted drafts of the Supply Agreement and the Post-Closing Employment Agreement are "Exhibits" of the APA that are "incorporated into" and "made a part []of" the APA, and thus admissible as probative of the intent of the parties of the APA to the extent that drafting the MPSA and the Post-Closing Employment Agreement was part of the negotiations of the APA. *See* D.I. 122-2 at 5, § 1.1 (defining "Exhibits" to mean "the exhibits attached to this Agreement"); D.I. 122-2 at 57, § 8.1.7 (referring to an unexecuted, draft Post-Closing Employment Agreement for Benton attached to the APA as Exhibit C-2); D.I. 122-2 at 58, § 8.3.1(g) (referring to an unexecuted, draft Supply Agreement attached to the APA as Exhibit G); D.I. 122-2 at 14, § 1.3(f) (providing that "[t]he Disclosure Schedules and Exhibits to this Agreement are incorporated herein by reference and made a part hereof for all purposes" in a section titled "Construction"); D.I. 122-2 at 68, § 11.7 (referring to "the Schedules and Exhibits attached to this Agreement" as "each . . . incorporated into this Agreement").

4

## II.

I turn then to the Counterclaims in question.

## A.

First, I will deny the Motion insofar as it seeks dismissal of the breach of contract claim under Section 7.14 of the APA in Benton's Counterclaim IV.

Plaintiffs argue, and Benton does not dispute, that "to survive a motion to dismiss, a claim for breach of contract must identify a breached provision of a contract." D.I. 122 at 8 (quoting *Berg v. C&H Fin. Services, Inc.*, 2024 WL 1255504, at *3 (D. Del. Mar. 25, 2025)); D.I. 132 at 5 (same); *see* D.I. 128 at 8 (Benton quoting the same). Counterclaim IV identifies Section 7.14 of the APA and, specifically, its requirement for Lennox "to transfer or cause the transfer of such right(s) [to sell skylight products other than metal curbs and HVAC curb adaptors] to Benton and his affiliates at no cost and without delay" as the breached provision of a contract. D.I. 119 ¶ 202; *see also* D.I. 122 at 8 (Plaintiffs acknowledging that Counterclaim IV cites Section 7.14 of the APA); D.I. 132 at 5–6 (Plaintiffs acknowledging "Benton's reference to the 'Misallocated Assets' provision in § 7.14 of the APA"). Counterclaim IV sufficiently alleges the existence of a contract (the APA) necessary for a breach of contract claim. And the breach of contract claim under Section 7.14 of the APA in Counterclaim IV survives the first basis of Plaintiffs' Motion.

Plaintiffs also argue that Counterclaim IV does not allege sufficient facts to plausibly allege a breach of contract claim under Section 7.14 of the APA. D.I. 122 at 9; D.I. 132 at 5–6. Plaintiffs specifically argue that "there is no mistakenly transferred asset to return to Benton." D.I. 122 at 9; *see also* D.I. 132 at 6 (arguing that the Counterclaims fail to plausibly explain how the "right to sell skylight products other than metal curbs and HVAC curb adapters" was explicitly excluded from the Purchased Assets by the APA, was "transferred" to Plaintiffs "in error" "following the Closing," or is the type of tangible asset that could be returned under Section 7.14 of the APA). But Section 7.14 of the APA does not refer only to an "asset" or "tangible asset" and instead refers to "any right, property or asset not forming part of the Purchased Assets." D.I. 122-2 at 55, § 7.14. And Benton alleges that "rights to sell skylight products other than metal curbs and HVAC curb adapters" (D.I. 119 ¶¶ 201–02), including "an exclusive right to sell metal (galvanized steel or aluminum) skylight caps" for a five-year period (D.I. 119 ¶¶ 3, 198, 202) and "the right to exclude Sun[o]ptics from participating in products actively sold or marketed as of the date of the APA" (D.I. 119 ¶¶ 40, 42, 198), were obtained by Plaintiffs in error—i.e., mistakenly interpreted as included within the Purchased Assets—and that Plaintiffs have not transferred or caused to be transferred such right back to Benton. D.I. 119 ¶¶ 3, 201–03. Whether such right was "mistakenly" transferred to Plaintiffs or "can be returned to Benton"

6

raises a factual dispute that cannot be resolved on a motion to dismiss.[1]

Counterclaim IV sufficiently alleges the breach of an obligation imposed by Section 7.14 of the APA and thus survives the second basis of Plaintiffs' Motion.

B.

Second, I will deny the Motion insofar as it seeks dismissal of Benton's request for a declaratory judgment under the APA in Counterclaim V.

Benton asks in Counterclaim V for a declaration of "the rights of the parties under the APA and its Ancillary Agreements" (D.I. 119 ¶ 208), including "the right of Benton to operate the Sun[o]ptics business without restriction, except as to the negotiated restrictions on manufacturing and selling metal curbs and HVAC curb adapters" (D.I. 119 ¶ 207) and the right of "Benton to sell the Sun[o]ptics aluminum 100% opaque skylight cover as well as other products that are not metal curbs or HVAC curb adapters without restriction during the period after closing of the APA" (D.I. 119 ¶ 206). Benton is a party to the APA and has standing to pursue a declaration of rights of the parties under the APA. *See* D.I. 122-2 at 1–2

---

[1] *See, e.g.*, 11.19.25 Prelim. Inj. H'rg Tr. (docketed as D.I. 81) 35:23–36:12 (Benton's counsel representing that "we did not exclude [the AES model number curb cap 5060] product as an asset that was purchased. We do not dispute that AES has the right to continue manufacturing and selling that product. It was always the parties' intent that AES post-acquisition would be able to continue manufacturing and selling that skylight product in galvanized steel as it had with its other galvanized steel manufacturing equipment.").

7

(defining the "Parties" to the APA as Sellers Benton, AES Industries, Inc., and AES Mechanical Services Group, Inc. and Buyer Lennox AES Holdings LLC); D.I. 122-2 at 70 (AES Industries, Inc., AES Mechanical Services Group, Inc., Benton, Lennox AES Holdings LLC, and Lennox International, Inc. signing and executing the APA).

Whether Benton has the rights he says the APA gave him turns largely on the APA's definition of "Business." I ruled in my December 9, 2025 Memorandum Opinion on Plaintiffs' Motion for Preliminary Injunction that the APA recital's definition of "Business" is ambiguous under Delaware law. D.I. 82 at 16. Trial will thus explore the intrinsic and extrinsic evidence upon which the parties rely to support their competing interpretations of the term "Business."

## C.

Third, I will deny the Motion insofar as it seeks dismissal of Benton's claim of personal reputational harm resulting from tortious interference with Benton's prospective business relationships with Walmart and Costco in Benton's Counterclaim VI.

Benton alleges that "Lennox . . . has harmed Benton's reputation of honesty, integrity, and value with Walmart in ways that may have permanent consequences." D.I. 119 ¶ 216; *see also* D.I. 128 at 14–15 (Benton arguing that he "personally cultivated the relationships with Walmart and Costco, personally

8

pitched the aluminum skylight cover, personally communicated about the product, and suffered personal reputational harm from Lennox's representations") (citing D.I. 119 ¶¶ 94, 101–13, 127, 212–17). Accordingly, Benton has standing to pursue his claim of personal reputational harm resulting from tortious interference with Benton's prospective business relationships with Walmart and Costco in Benton's Counterclaim VI. *See, e.g.*, *Total Care Sys., Inc. v. Coons*, 860 F. Supp. 236, 240 (E.D. Pa. 1994) ("Coons alleges that he himself has suffered monetary, emotional and reputational injuries as a direct result of TCS' alleged interference. From the point of view of standing, therefore, Coons can bring these tortious inference claims before this Court.").

### D.

Finally, to the extent that Benton's Counterclaims VII and VIII are pled in the alternative to Benton's Counterclaim IV (D.I. 119 at 80, 82; D.I. 119 ¶¶ 229, 234–35), I will deny the Motion insofar as it seeks dismissal of the promissory estoppel claim in Benton's Counterclaim VII and the intentional/negligent misrepresentation claim in Benton's Counterclaim VIII.

Benton's Counterclaims VII and VIII are based on the alleged misrepresentation by Plaintiffs that "Lennox recognized Benton's right to operate the Sun[o]ptics business without restriction except as to precluding the manufacture and sale of metal curbs and HVAC curb adapters for defined periods."

9

D.I. 119 ¶¶ 223, 231; *see also* D.I. 119 ¶ 229 (referring to "the negotiated right of Benton to sell non-HVAC curb adapters and non-HVAC aluminum skylight curb covers, among other unrestricted products"); D.I. 119 ¶ 4 (referring to "Benton's negotiated right to cause Sun[o]ptics to sell non-HVAC aluminum skylight curb covers, among other unrestricted products"); D.I. 119 ¶ 5 (referring to "[Benton's] right to conduct the Sun[o]ptics business with only the restrictions on metal curbs and HVAC curb adaptors").

In deciding the Motion, I must assume as true Benton's allegation that an aluminum cap for a skylight opening "was markedly different from the roof curb cover brochure previous sold by AES and being sold by Lennox AES" (D.I. 119 ¶ 105) and draw all reasonable inferences in Benton's favor. *See Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). To the extent that "non-HVAC curb adapters and non-HVAC aluminum skylight curb covers, among other unrestricted products" are not "substantially similar" to "products or services . . . provided, distributed or sold by the Business, as conducted by the AES Companies prior to the Closing," the alleged promise and representation are consistent with and not addressed by Section 7.11 of the APA. (Section 7.11 does not go so far as to "limit[] Benton's operation of Sunoptics to how it was 'currently conducted'" as Plaintiffs argue (D.I. 122 at 18; *see also* D.I. 122 at 21); for example, Section 7.11 does not prevent Benton from causing Sunoptics to sell new products that are

10

"similar" but not "substantially similar" to products sold by "the Business, as conducted by the AES Companies prior to the Closing." *See* D.I. 122-2 at 54, § 7.11.1(b).) In other words, Plaintiffs' factual disputes with Benton's allegations cannot be resolved on motion to dismiss.

* * * *

NOW THEREFORE, at Wilmington on this Twenty-third Day of June in 2026, it is HEREBY ORDERED that:

1.  Lennox AES Holdings, LLC and Lennox AES Industries LLC's Motion to Dismiss Jason Benton's Counterclaims Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) (D.I. 121) is DENIED IN PART and DEFERRED IN PART;

2.  The Motion is DENIED insofar as it seeks dismissal of (1) the breach of contract claim under Section 7.14 of the APA in Benton's Counterclaim IV; (2) the request for a declaratory judgment under the APA in Benton's Counterclaim V; (3) the claim of personal reputational harm resulting from tortious interference with Benton's prospective business relationships with Walmart and Costco in Benton's Counterclaim VI; (4) the promissory estoppel claim in Benton's Counterclaim VII pled in the alternative to Benton's Counterclaim IV; and (5) the intentional/negligent misrepresentation claim in Benton's

11

Counterclaim VIII pled in the alternative to Benton's Counterclaim IV;
and

3.  Resolution of the Motion is DEFERRED insofar as it seeks dismissal of
Benton's Counterclaim I.

_____
                                CHIEF JUDGE